UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

Howard Lasker, on behalf of himself
and others similarly situated,

                    Plaintiff,            CV-08-0854
                                          (CPS)(RER)

    - against -                           MEMORANDUM OPINION
                                          AND ORDER
UBS Securities LLC and UBS Loan
Finance LLC,

                    Defendants.

-------------------------------------X

SIFTON, Senior Judge.

        Howard Lasker ("plaintiff"), on behalf of himself and others

similarly situated, filed this purported class action against UBS

Loan Finance LLC and UBS Securities LLC (collectively "UBS") on

February 1, 2008[1] for tortious interference with a business

relationship arising out of the planned, but aborted, merger

between Genesco, Inc. ("Genesco") and The Finish Line, Inc.

("Finish Line").  Now before this court is UBS's motion to

dismiss pursuant to Federal Rules of Civil Procedure 12(b)(3),

12(b)(6), and 12(b)(7)[2].  For the reasons set forth below,

--------------------

        [1] The case was originally filed in New York State Supreme Court and
removed to this Court on February 28, 2008.   This action was removed to
federal court, pursuant to 28 U.S.C. § 1332(d)(2), since it is a purported
class action.  28 U.S.C. § 1332(d)(2)(A) gives federal courts original
jurisdiction over class actions where the amount in controversy exceeds
$5,000,000 and a member of the class of plaintiffs is a citizen of a different
state from any defendant.

        [2] Fed. R. Civ. Pro. 12(b)(7) provides for dismissal where there has
been a failure to join a party under Rule 19.  Though referred to in their
Notice of Motion, defendants made no arguments to dismiss on this ground in
their memoranda of law, and clarified they were not pursuing dismissal on

defendants' motion is denied.

## Background

The following facts are taken from plaintiff's complaint in this action ("Complaint") and the parties' papers submitted in connection with this motion. The facts alleged in the Complaint are presumed to be true for the purposes of the 12(b)(6) motion to dismiss.

Plaintiff is a resident of Brooklyn, New York, and a holder of Genesco common stock. Non-party Genesco, a Tennessee corporation that maintains its headquarters[3] in Nashville, Tennessee, is a retailer and wholesaler of branded footwear and a retailer of branded head wear. Genesco's shares are traded on the New York Stock Exchange. Non-party Finish Line, an Indiana corporation that maintains its headquarters in Indianapolis, Indiana, is a large mall-based retailer of athletic apparel and shoes operating under the Finish Line, Man Alive, and Paiva brand names. Finish line's shares are traded on the NASDAQ Global Select Market. Headwind, Inc. ("Headwind") is a Tennessee corporation and wholly owned subsidiary of Finish Line formed for the sole purpose of completing a merger between Finish Line and Genesco.

---

12(b)(7) grounds at oral argument.

[3] As Genesco and Finish Line are not parties to this action, I need not determine their principal places of business.

Defendants UBS Securities LLC and UBS Loan Finance LLC are wholly owned subsidiaries of UBS AG and Delaware corporations with their principal places of business in New York.[4]  UBS AG is a prominent investment banking and securities firm headquartered in Zurich, Switzerland.

On June 17, 2007, Finish Line entered into an Agreement and Plan of Merger ("Merger Agreement") to acquire Genesco.  UBS Securities LLC served as Finish Line's financial advisor in connection with the merger and issued an opinion to Finish Line that the merger was fair from a financial point of view to Finish Line and its shareholders.  Pursuant to the Merger Agreement, Finish Line was to pay $54.50 per share in cash for all the outstanding common stock of Genesco held by plaintiff and other members of the purported class.  The merger was to be funded by $1.6 billion in debt financing from UBS.  The Merger Agreement expressly stated that it conferred no rights upon any party as a third-party beneficiary.  Further, pursuant to the Merger Agreement, if Genesco suffered a Material Adverse Effect, UBS would be excused from its obligations.  Both the Merger Agreement and Commitment Letter, however, specifically excluded performance

---

[4] According to plaintiff's complaint, UBS Loan Finance LLC maintains offices in Connecticut, but defendants state in their removal papers that UBS Loan Finance LLC's principal place of business is New York.  There appears (at least at this point) no dispute that at least one member of the plaintiff class is a citizen of a state other than Delaware, New York, or Connecticut.  See 28 U.S.C. § 1332(d)(2)(A).  Such jurisdictional issues will have to be more definitively resolved on any motion for class certification at the latest.  See 28 U.S.C. § 1332(d)(7).

shortfalls due to industry-wide fluctuations from the definition

of Material Adverse Effect.[5]

Finish Line and UBS executed a commitment letter

("Commitment Letter") setting forth the terms of the financing on

June 17, 2007.  Also on June 17, 2007, Finish Line filed a Form

8-K[6] with the Securities and Exchange Commission ("SEC"),

announcing the UBS commitment.

---

[5]  Section 3.1(a) of the Merger Agreement defines Company Material
Adverse Effect, in relevant part, as follows:

> [A]ny event, circumstance, change or effect that, individually or
> in the aggregate, is materially adverse to the business, condition
> (financial or otherwise), assets, liabilities or results of
> operations of the [Genesco] and [Genesco] Subsidiaries, taken as a
> whole; provided, however, that none of the following shall
> constitute, or shall be considered in determining whether there
> has occurred, and no event, circumstance, change or effect
> resulting from or arising out of any of the following shall
> constitute a . . . Material Adverse Effect: . . . (B) changes in
> the national or world economy or financial markets as a whole or
> changes in general economic conditions that affect the industries
> in which [Genesco] and the [Genesco] Subsidiaries, so long as such
> changes or conditions do not adversely affect [Genesco] and the
> [Genesco] Subsidiaries . . . in a materially disproportionate
> manner relative to other similarly situated participants in the
> industries or markets in which they operate . . .  (D) the
> failure, in and of itself, of the Company to meet any published or
> internally prepared estimates of revenues, earnings or other
> financial projections, performance measures or operating
> statistics; provided, however, that the facts and circumstances
> underlying any such failure may, except as may be provided in
> subsection (A), (B), (C), (E), (F), and (G) of this definition, be
> considered in determining whether a Company Material Adverse
> Effect has occurred . . .

Shapiro Decl. Ex. 1, at 8-9 (Merger Agreement).

[6]  A Form 8-K is the SEC form used for companies' current reports
pursuant to Sections 13 and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a)(2),
78o(d). A Form 8-K must be filed upon the occurrence of certain significant
corporate events as defined by the SEC and may be filed with respect to any
other matter the company considers of material importance.

Genesco filed its proxy statement[7] with the SEC on July 11, 2007.  On July 23, 2007, the SEC notified Genesco that it would not review the proxy statement and that Genesco could file and disseminate it.  Shortly thereafter, Finish Line informed Genesco that it needed additional time to complete the UBS financing transaction.

On August 6, 2007, an article in the *Indianapolis Buisness Journal* reported that tightening of the credit markets along with a decline in Finish Line's operating performance and stock price "spooked" UBS and that some analysts had begun speculating whether UBS would "pull the plug" on its financing commitment. The article further reported that Finish Line's Chief Financial Officer, Kevin Wampler, stated during a June 29, 2007 conference call with analysts that neither Finish Line's falling share price nor the tightening of the credit markets "give UBS an out" of its financing commitment.

On August 14, 2007, the necessary regulatory approvals for the merger were obtained.  On August 30, 2007 Genesco issued a press release announcing its second quarter 2007 financials. Genesco's earnings were lower than analysts' estimates and reported a loss of $0.13 per share.

---

[7]  Congress and SEC proxy rules require that specified information be given to security-holders either before or at the time of a proxy solicitation, regulate the presentation of that information, and prohibit false or misleading statements in proxy materials. *See* 15 U.S.C. § 78n(a); 17 C.F.R. §§ 240.14a-1 — 240.14b-2.

On September 11, 2007, UBS wrote to Finish Line that UBS was "extremely concerned" about the "apparent deteriorating financial position" of Genesco and that UBS was reserving its rights with respect to its obligation to complete the financing. The financial results announced by Genesco on August 30, 2007, were consistent with results experienced by its peers, including Finish Line.[8] UBS had been receiving weekly updates concerning Genesco's financial results.

On September 13, 2007, UBS wrote a second letter to Finish to report that UBS was "not yet satisfied that Genesco has not experienced a Material Adverse Effect." On September 14, 2007, in response to this contention, Genesco issued a press release stating, "no 'material adverse effect' under the previously announced merger agreement with Finish Line has occurred with respect to Genesco."

On September 17, 2007 Genesco's shareholders, at a special shareholder meeting concerning the merger, approved the merger. Thus, as of September 17, 2007, Genesco had satisfied all of the pre-conditions to closing set forth in the Merger Agreement. Pursuant to the Merger Agreement, an obligation to close on or before September 19, 2007 was triggered.

On September 18, 2007, counsel for Finish Line e-mailed

---

[8] For example, on September 13, 2007, Finish Line issued a press release noting decreased sales and giving explanations similar to those given by Genesco, including a shift of certain states' sales tax holidays to August and later school start dates in several states.

counsel for Genesco to advise Genesco that UBS decided to stop any further work towards closing the financing transaction "pending the results of its analyses of Genesco's financial condition and performance."

On September 19, 2007, Genesco issued a press release which contained a letter from its Chairman and Chief Executive Officer, Hal Pennington.  Pennington stated Finish Line and UBS had failed to meet deadlines for obtaining the UBS financing needed to consummate the merger and set forth his belief that UBS was looking for a way out of its commitment because certain external factors, including upheaval in the credit markets, made the merger less profitable for UBS.[9]

Also on September 19, 2007, Finish Line issued a press release announcing that UBS had decided to stop work on the closing documents for the financing and that Finish Line would "consider its options" under the Merger Agreement.

On September 21, 2007, Genesco filed suit in Chancery Court in Nashville, Tennessee ("Chancery Court"), against Finish Line

---

[9] On October 1, 2007, UBS revealed that it would write down $3.6 billion from bad investments related to, among other things, United States sub-prime mortgages.  Mark Rohner, UBS AG's Chief Executive Officer, announced that UBS AG was changing the bank's investment focus as it had been too free with its funding in high volume, high grade exposure.  Shortly thereafter, UBS AG admitted it was unlikely to be profitable in the fourth quarter of 2007 because of further possible write downs.  UBS AG further stated that of the more than $40 billion it held in sub-prime paper or collateralized debt obligations ("CDO"), $13.8 billion in mezzanine CDO's could be vulnerable (mezzanine classes of investments are usually second to senior classes to receive interest and principal payments in the case of default).  UBS reported further negative news in December 2007, including a December 10, 2007 announcement that it would write down $10 billion in bad investments.

and UBS ("Genesco Action") seeking an order requiring Finish Line
to consummate the Merger with Genesco and to enforce Finish
Line's rights against UBS under the Commitment Letter.  UBS and
Finish Line asserted a contract and two tort defenses to closing
the merger.  First, they argued that Genesco had suffered a
Material Adverse Effect.  They further argued that Genesco
committed securities fraud and fraudulently induced Finish Line
to enter into the Merger Agreement by failing to provide material
information concerning Genesco's May performance and updated
projections to Finish Line prior to the signing of the Merger
Agreement.[10]

On October 9, 2007, plaintiff filed a purported class action
in the Chancery Court against Finish Line, Headwind, and UBS
("Lasker State Action").  The factual predicate for plaintiff's
claims against the defendants in the Lasker State Action was the
same as the predicate in the instant matter, the aborted Genesco-
Finish Line merger.  As in the complaint in this case, plaintiff
accused UBS of undermining the merger and asserted that UBS's
alleged conduct harmed Genesco shareholders by preventing the
merger from closing.  Plaintiff sought to compel Finish Line's
specific performance of the Merger Agreement or, in the

---

[10]  On November 26, 2007, Genesco received a subpoena from the United
States Attorney's Office for the Southern District of New York for all
documents relating to Genesco's negotiations and Merger Agreement with Finish
Line.  The subpoena stated that the documents were sought in connection with
alleged violations of federal fraud statutes.

alternative, compensatory damages.  Against UBS, plaintiff
alleged that UBS aided and abetted breach of the Merger Agreement
and sought compensatory damages.  He later re-characterized his
claim as one of procurement of breach of contract.[11]  Chancellor
Lyle, of the Chancery Court, dismissed these claims on November
30, 2007, ruling that, in light of the express disclaimer in the
Merger Agreement of third-party beneficiaries, Genesco's
shareholders were not parties to the contract and lacked standing
to assert claims based upon the document.

Chancellor Lyle tried the Genesco Action from December 10
through December 18, 2007.  On December 27, 2007, Chancellor Lyle
ruled that all conditions to the Merger Agreement had been met
and that UBS had not been defrauded by Genesco.  Though the court
concluded that a Material Adverse Effect had occurred, it found
that it was not grounds to invalidate the Merger Agreement
because it was caused by general economic conditions, which had
been eliminated as a basis for invalidation in the Merger
Agreement itself.  Accordingly, the Chancery Court ordered Finish

---

[11]  Under Tennessee Law, procurement of breach of contract requires
proof of seven elements:  (1) a legal contract to which plaintiff is a party;
(2) knowledge of the existence of the contract; (3) an intention to induce its
breach; (4) malice; (5) breach of contract; (6) proximate cause; and (7)
damages.  *Hauck Mfg. Co. v. Astec Industries, Inc.*, 376 F.Supp. 2d 808, 832
(E.D.Tenn. 2005); *see also Federated Rural Elec. Ins. Exchange v. Hill*, 2007
WL 907717, at *13 (Tenn. Ct. App. Mar. 26, 2007).  In Tennessee, the common
law action for tortious interference with contract and the statutory action
for unlawful procurement of breach of contract, *see* Tenn. Code Ann. §
47-50-109, have the same elements and operate as alternative theories of
recovery.  *Hauck Mfg.*, 376 F. Supp.2d at 832.

Line specifically to perform the terms of its Merger Agreement with Genesco.[12]  The Chancery Court noted, however, that there was a pending declaratory judgment action in the Southern District of New York between UBS, Finish Line, and Genesco in which UBS sought a declaration that the combined Finish Line-Genesco entity would be insolvent ("Declaratory Judgment Action"), and if that court concluded the combined entity would be insolvent, the merger would be halted.[13]

## Discussion

Defendants move to dismiss based on the doctrine of abstention set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the doctrine of *forum non conveniens*, and a failure to state a claim.

### I. <u>Abstention</u>

Where there are concurrent state and federal court proceedings, a district court may abstain from exercising its jurisdiction in exceptional circumstances, when the concept of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" so counsels.  *Colorado River*, 424 U.S. at 817-18 (quoting

---

[12]  Both UBS and Finish Line appealed this decision.

[13]  UBS filed the Declaratory Judgment Action on November 15, 2007.  On March 4, 2008, the parties resolved the claims between them and executed a settlement agreement and mutual release.  Pursuant to the settlement, UBS and Finish Line transferred to Genesco $175 million and 12% of Finish Line stock.  Further, Genesco's claims against UBS and Finish Line, including the claims in the Chancery Court, as well as the Merger Agreement, were terminated.

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180

(1952)).[14]  Abstention under *Colorado River* is only appropriate

if the concurrent proceedings are parallel, meaning they involve

substantially the same parties and issues.  *See Dittmer v. Cty.*

*of Suffolk*, 146 F.3d 113, 117-18 (2d Cir. 1998).  If the actions

are parallel, the district court next considers six factors in

further evaluating whether the exceptional circumstances required

for abstention are present:

> (1) whether the controversy involves a *res* over which
> one of the courts has assumed jurisdiction;
> (2) whether one forum is more inconvenient than the
> other for the parties;
> (3) whether staying the federal action will avoid
> piecemeal litigation;
> (4) whether one action is significantly more advanced
> than the other;
> (5) whether federal or state law provides the rule of
> decision;
> (6) whether the federal plaintiff's rights will be
> protected in the state proceeding.

*Moses H. Cone Memorial Hosp. v. Mercury Construction,* 460 U.S. 1,

15-16, 19-23, 26 (1983).[15]

---

[14]  In *Colorado River*, the United States brought suit in federal
district court, on behalf of itself and certain Indian tribes, to settle water
rights against private water users.  Prior to its filing of the suit in
federal court, however, lengthy proceedings concerning these same water rights
had been held in Colorado Water Division 7, in which the United States had
been joined as a defendant, pursuant to the McCarran Amendment, 43 U.S.C. §
666.  The Supreme Court affirmed the district court's dismissal of the federal
proceeding, citing the danger of piecemeal litigation, the absence of any
proceedings in the district court beyond the motion to dismiss, the extent to
which state water rights were involved, the considerable geographic distance
between the district court and the state court, and the government's
participation in the state court proceeding.  424 U.S. 819-20.

[15]  In *Cone*, the hospital sued for declaratory judgment regarding rights
and liabilities under a contract between it and Mercury.  Mercury subsequently
brought suit in federal court to compel arbitration.  The district court
stayed the suit pending resolution of the state court action, but the Supreme

The Supreme Court stated that no single factor is necessarily dispositive, and that the test "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone*, 460 U.S. at 16; *see also Colorado River*, 424 U.S. at 818-19. Thus, the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it. For example, with respect to the first *Colorado River* factor, "the absence of a *res* point[s] toward exercise of federal jurisdiction." *Village of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999) (internal quotation marks omitted).

A.  Parallel Chancery Court Proceeding

The Lasker State Action in the Tennessee Chancery Court is parallel to this action. The plaintiff is the same and UBS is a defendant in both actions.[16] Plaintiff alleges essentially the same facts and seeks the same relief, compensatory damages because the merger did not close, although under a new legal theory.[17] *Telesco v. Telesco*, 765 F.2d 356, 362 (2d Cir. 1985)

_____

Court reversed, finding that the above factors counseled against the stay.

[16] Finish Line and Head Wind are also defendants in the Lasker State Action. But this is not fatal to the argument that the actions are parallel. *Bernstein v. Hoisery Manufacturing Corporation of Morganton, Inc.*, 850 F. Supp. 176, 184 (E.D.N.Y. 1994) (Abstention under *Colorado River* does not require identical parties in the parallel actions).

[17] Defendants contend that plaintiff's claim in this action and the Lasker State Action are the same. However, tortious interference with a contract and tortious interference with a business relationship are different

(district court did not abuse its discretion in abstaining where, despite plaintiff's raising a new legal theory in one action not raised in the other, the federal and state action were "essentially the same," the alterative theory could still be raised in the state court proceeding, and state courts had exercised jurisdiction over the matter for years);[18] *see also Nieves v. Board of Educ.,* 2006 WL 2989004, at *2 (E.D.N.Y. Sept. 15, 2006) ("As the suits here raise the same issues as to the defendants' duties arising out of the same events, they are sufficiently parallel to justify the application of *Colorado River*"); *see also Bernstein v. Hosiery Mfg. Corp. of Morganton, Inc.,* 850 F. Supp.176, 184 (E.D.N.Y. 1994) ("The fact that precisely the same claims are not made in the two proceedings, or that alternative forms of relief are sought in the two actions, does not mean the actions are not duplicative or parallel. What matters is that the claims concern the same events and involve sufficient overlap of subject matter").[19]

_____

torts and thus plaintiff has presented a new legal theory. *See*, *e.g.*, *A.F.C. Enterprises, Inc. v. New York City School Construction Auth.*, 2001 WL 1335010, at *14 (E.D.N.Y. Sept. 6, 2001).

[18] Defendants assert that *Telesco* requires abstention in this case. That reading is incorrect, as the *Telesco* decision noted that the alternative legal theory could be raised in the state court proceeding, which is not the case here because the parallel proceeding has been dismissed and the dismissal is on appeal. Moreover, the *Telesco* court held only that the district court did not abuse its discretion in abstaining.

[19] Plaintiff cites *Vladimir v. Cowperthwait*, 2007 WL 196407 (S.D.N.Y. Jul. 3, 2007) in support of his argument that the actions are not parallel. *Vladimir*, however, appears inconsistent with the cases cited above and the weight of the authority supports the conclusion that the actions are parallel.

In all events, the fact that the concurrent actions in this case may be parallel does not, on its own, demonstrate the "exceptional circumstances" required for abstention. I therefore turn to the factors set forth in *Colorado River.*

B. *Colorado River* Factors

i. *Res*

There is no *res* at issue in this case. Thus, this factor weighs against abstention. *De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989).

ii. *Convenience*

Defendants contend that the Eastern District of New York is an inconvenient forum. Given that UBS itself commenced the Declaratory Judgment Action in the Southern District of New York, and both plaintiff and at least one of the defendants is present in New York, this factor weighs against abstention. *Id.*[20]

iii. *Risk of Piecemeal Litigation*

For plaintiff to bring this claim in Tennessee, he would be required to commence a new action, unless the Chancery Court's

---

Plaintiff also cites this Court's decision in *Bailey v. Tricolla*, 1996 WL 733078 (E.D.N.Y. Dec. 11, 1996). *Bailey* is inapposite, however, because federal claims were present in the case before this Court and because there were no concerns regarding *res judicata*. Should the Chancery Court's decision in the Lasker State Action be upheld, the question of whether plaintiff's current claim is precluded will arise, according to defendants.

[20] I discuss the issue of the convenience of the forum more fully below, as defendants have also moved to dismiss on the grounds of *forum non conveniens*.

decision in the Lasker State Action is reversed.  Thus, the
concern that there would be a greater danger of piecemeal
litigation if this court were to hear plaintiff's claim than if
the claim were heard in Tennessee state court is not very
persuasive.  Moreover, as a claim for tortious interference with
business relationships can be raised independently from a claim
for tortious interference with contracts, this Court would not be
deciding issues already determined, or to be determined, by the
Chancery Court.

If the decision in the Lasker State Action is upheld, then
the question of claim preclusion will arise, according to
defendants.  *McKinney v. Widner*, 746 S.W.2d 699, 705 (Tenn. Ct.
App. 1987) (the doctrine of res judicata bars all claims and
issues which are relevant and which could reasonably have been
litigated in former action).  Though such a contingency can be
the basis for abstention, *see Arkwright-Boston Mfrs. Mut. Ins.
Co. v. City of New York*, 762 F.2d 205, 211 (2d Cir. 1985), this
case involves only two parties and there is only one parallel
proceeding.  There is little risk that several different courts
will reach different conclusions concerning the issues of claim
preclusion.  Litigation with respect to this issue can be
accomplished as easily before this court as the Chancery Court.

iv.  *Advancement of Actions*

The Lasker State Action has already proceeded to a judgment,

which has been appealed.  Though the Lasker State Action is more
advanced than the instant proceeding, there is no indication that
extensive discovery has already been taken in that action, which
was dismissed within two months of its filing.  Should the
Chancery Court's decision be reversed, the proceedings would be
at substantially the same stage in both courts.

While I conclude that this factor weighs in favor of
abstention, its weight is limited.

v.   *Substantive Law*

Plaintiff's claim is governed by Tennessee law.[21]  That fact
"does not militate strongly against the exercise of federal
jurisdiction." *Prosperity Realty, Inc. v. Haco-Canon*, 724 F.
Supp. 254, 257 (S.D.N.Y. 1989); *see Bethlehem Contracting Co. v.
Lehrer/McGovern, Inc.*, 800 F.2d 325, 328 (2d Cir. 1986) (only "in
some rare circumstances may the presence of state law issues . .
. weigh in favor of . . . surrender" of federal jurisdiction).
The Second Circuit has held that "the absence of federal issues
does not strongly advise dismissal, unless the state law issues
are novel or particularly complex." *Welch's*, 173 F.3d at 124.

The issue of whether Tennessee recognizes a tort of
interference with a business relationship under the circumstances

---

[21]  No party disputes that Tennessee law is applicable.

present in this case is a novel issue.[22]  *See Great South Bay
Medical Care, P.C. v. Allstate Ins. Co.*, 204 F. Supp.2d 492, 498
(E.D.N.Y. 2002) (abstaining where state law at issue is novel,
unsettled, and currently winding its way through the lower courts
of the State of New York).  However, it is not unprecedented, and
arguably it is novel only because Tennessee did not adopt the
tort at issue until 2002, in *Trau-Med of America, Inc. v.
Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002).

In *Harger v. Price*, 204 F. Supp.2d 699, 709 (S.D.N.Y. 2002),
the court held, interpreting New York law, that plaintiff, who
alleged his shares were improperly cancelled prior to a merger,
had a "prospective business relationship" with the acquiring
company on the theory that negotiations began prior to the date
plaintiff's shares were cancelled.[23]  Similarly, in *Malpiede v.
Townson*, 780 A.2d 1075, 1099 (Del. 2001), the Delaware Supreme
Court held that, at the time a bidder misrepresented its
ownership interest in the target company which allegedly caused
the target's board to not consider a higher, competing offer, the
target corporation's "shareholders could reasonably expect to

---

[22]  Defendants argue in their motion that Tennessee clearly does not
recognize a business relationship in situations such as plaintiff's.  Were
this the case, such clarity in state law would not favor abstention.  At oral
argument, defendants argued more persuasively, and admittedly inconsistently,
that whether Tennessee recognizes a business relationship based on these facts
is a novel issue, and that this novelty favors abstention.  It is this
argument that I address now.

[23]  The court further noted, however, that "the question perhaps is not
free from doubt."  *Harger*, 204 F. Supp.2d at 709.

benefit from the possibility of a higher . . . offer."[24]  *See also Tooley v. Axa Financial, Inc.*, 2005 WL 1252378, at *5 (Del. Ch. May 13, 2005) (in dicta, noting that plaintiff shareholders would have had a reasonable expectancy of payment under merger agreement once conditions precedent to closing had been met). While there are distinctions between the above-cited cases and this one, the differences can be as easily resolved here as in Tennessee.

Thus, while this factor weighs in favor of abstention, it does so in a limited manner as the novelty does not equate with uncertainty.

### vi.  *Prejudice to Plaintiff*

"This factor, like choice of law, is more important when it weighs in favor of federal jurisdiction." *Bethlehem Contracting Co.*, 800 F.2d at 328.  In evaluating this element, "federal courts are to determine whether the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Welch's*, 170 F.3d at 124.  Due to the posture of the parallel state action, plaintiff cannot currently bring his claims there.  The cases cited by defendants to show that plaintiff would not be

---

[24]  Though these cases were decided under New York and Delaware law, respectively, the elements of New York's tort of tortious interference with prospective economic advantage and Delaware's tort of tortious interference with business relations are substantially similar to the Tennessee tort at issue.  *See Harger*, 204 F. Supp.2d at 709; *Malpiede*, 780 A.2d at 1099; *Trau-Med* 71 S.W.3d at 701.

prejudiced are inapposite as in those cases plaintiff could have addressed his claim in the parallel state court action rather than bringing a new action in state court.  Thus, this factor weighs against abstention.

vii.  *Vexatious or Reactive Nature of Litigation*

Though not an enumerated factor, I am mindful that the Supreme Court stated there is "considerable merit" to the idea "that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River*."  *Cone*, 460 U.S. at 17 n. 20.  That plaintiff did not sue in New York until his claims had been dismissed by the Chancery Court supports an inference that this claim is reactive as it would not have been brought but for the Chancery Court's dismissal.  But there were no conclusions in the Chancery Court's ruling that would have precluded plaintiff from bringing his current claim in a new action in that court, so he does not appear to be circumventing an adverse ruling.

C.  Weighing The Factors

Weighing these factors, those that favor abstention weigh only slightly in favor of that course, and combined they do not present the "extraordinary circumstances" required under *Colorado River*.  Moreover, they are outweighed by the factors that counsel against abstention, particularly plaintiff's inability at present

to bring this claim in the parallel proceeding.  Defendants'
motion to dismiss on the basis of the doctrine of *Colorado River*
abstention is denied.

    II.  Forum Non Conveniens

    The doctrine of *forum non conveniens* permits a court, in its
discretion, "to resist the imposition upon its jurisdiction,"
even though jurisdiction may be lawfully exercised and venue is
technically proper, where the convenience of the parties and
interests of justice favor trial in another forum.  *Gulf Oil
Corp. v. Gilbert*, 330 U.S. 501, 507 (1947); *see also Koster v.
Am. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947).
"Although a district court enjoys broad discretion in applying
this principle," the Second Circuit "has outlined a three-step
process to guide the exercise of that discretion."  *Norex
Petroleum Ltd. v. Access Industries, Inc.*, 416 F.2d 146, 153 (2d
Cir. 2005).

    First, the court must determine the degree of deference
properly accorded to plaintiff's choice of forum.  *Iragorri v.
United Tech. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).  Second, the
court must determine whether an alternative and adequate forum
exists.  *Id.* at 73.  Lastly, the court must balance the private
and public interests implicated in the choice of forum. *Id.* at
73-74.  To prevail on a motion to dismiss based on *forum non
conveniens*, a defendant must demonstrate that an adequate

alternative forum exists and that, considering the relevant private and public interest factors set forth in *Gilbert*, discussed *infra*, the balance of convenience tilts strongly in favor of trial in the foreign forum. *R. Maganlal & Co. v. M.G. Chemical Co., Inc*., 942 F.2d 164, 167 (2d Cir. 1991).

Plaintiff resides within the forum. Nevertheless, because he is a plaintiff in class action, his choice of forum is given less weight than if he were an individual plaintiff. *Eichenholtz v. Brennan*, 677 F. Supp. 198, 202 (S.D.N.Y. 1988). There are also indications that plaintiff filed suit in this court because of the adverse ruling in the Tennessee court. *See Norex Petroleum Ltd. v. Access Indus., Inc*., 416 F.3d 146, 155 (2d Cir. 2005) (sliding scale of deference tilts in favor of dismissal where choice of forum is "indicative of forum shopping"). However, since plaintiff's claim will be decided under Tennessee law he can hardly be said to be seeking local laws that might favor his position.

It is undisputed that an adequate alternative forum exists in Tennessee.

Although plaintiff's choice of forum is entitled to less deference than it otherwise might be and an adequate, alternate forum exists, a balancing of the public and private factors does not persuade me that dismissal is appropriate on the grounds of *forum non conveniens*. As to the private factors, the parties are

located in New York and perhaps Connecticut, process can obtained

for unwilling witnesses, and there is no evidence that the cost

for obtaining willing witnesses is prohibitive. As to the public

factors, New York has an interest in this litigation as both

plaintiff and one of defendants are located in New York, this

Court is not unusually burdened, and is capable of applying

Tennessee law. Indeed, that these factors counsel in favor of

maintaining jurisdiction is demonstrated by UBS's decision to

file the Declaratory Judgment Action in the Southern District of

New York. Accordingly, defendants' motion to dismiss on *forum*

*non conveniens* grounds is denied.

III. <u>Failure to State a Claim</u>

A. <u>12(b)(6) Standard</u>

In considering a motion pursuant to Rule 12(b)(6), a court

should construe the complaint liberally, "drawing all reasonable

inferences in the plaintiff's favor," *Chambers v. Time Warner,*

*Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*,

243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of

law or unwarranted deductions" need not be accepted. *First*

*Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.

1994). Indeed, conclusory allegations "will not suffice to

prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension*

*Plan*, 291 F.3d 236, 240 (2d Cir. 2002). On a motion to dismiss,

"[t]he issue is not whether a plaintiff will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1970 (2007). Although the complaint need not provide "detailed factual allegations," *id*. at 1964; *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n. 2 (2d Cir. 2007)(applying the standard of plausibility outside *Twombly*'s anti-trust context), it must "amplify a claim with some factual allegations . . . to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007) (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11). The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." *Bell Atlantic*, 127 S.Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)) ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard"). Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to

relief above the speculative level.'" *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

B.  Tortious Interference With a Business Relationship

Plaintiff has stated a claim under Tennessee law.  Under Tennessee Law, a claim for tortious interference with a business relationship requires the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortious interference.

*Trau-Med*, 71 S.W.3d at 701 (footnotes and citations omitted) (emphasis in original).  The *Trau-Med* Court stated that, with regard to improper motive or means, defendant's predominate purpose must be to injure plaintiff.  *Id*. at 701, n.5.  It also noted that interference with "a continuing business or other customary relationship not amounting to a formal contract," *id*. at 701, n.4 (emphasis removed), was protected.[25]

Although plaintiff relies on the somewhat novel theory that

---

[25] Defendants argue in their motion that Tennessee does not recognize a business relationship in situations such as plaintiff's.  They cite no authority for this proposition and the tort is not as limited as defendants argue.  Indeed, the court in *Trau-Med,* 71 S.W.3d at 701, n.4, adopted Restatement (Second) of Torts § 766B, cmt. c, which, as noted, provides that interference with "customary relationship[s] not amounting to a formal contract" are covered by the tort.

Genesco's shareholders had a economic expectancy in receiving the $54.50 per share once Genesco had satisfied the conditions precedent to closing, as discussed above, courts have recognized such a relationship as constituting a valid business relationship. *Harger*, 204 F. Supp.2d at 709; *Malpiede* 780 A.2d at 1099.

Defendants' attempts to distinguish these cases are not persuasive. While the target corporation in *Harger* was closely held and the remaining shareholders appeared to negotiate directly with the acquiring company, 204 F. Supp.2d at 703, plaintiff's legal theory was that he was deprived of his rightful share of the contingent compensation paid under a merger agreement. *Id.* at 709. In *Malpiede*, the target company was negotiating with potential acquirers, and the court nevertheless found the shareholders, who were in the same position as Genesco's shareholders, had an expectancy to benefit from an offer, and therefore all the more so from a signed merger agreement. 780 A.2d at 1099.[26] Accordingly, I conclude that

---

[26] Defendants argue that the merger was structured in such a manner that, unlike a tender offer, Finish Line did not offer to purchase Genesco stock directly from the shareholders. Rather, the Merger Agreement provided that Genesco would cancel its common stock and convert the shares into a right to receive the proceeds Genesco was to receive from Finish Line. The Merger Agreement, however, provides that Finish Line would deposit the necessary funds with a paying agent for direct transfer to Genesco shareholders. If Finish Line had not done so, Finish Line's counsel in the Genesco Action stated before Chancellor Lyle that under Tenn. Code Ann. § 48.21.107(b), plaintiffs would have an "absolute right to sue" Finish Line if for some reason Finish Line decided not pay the required sum into the paying agent. Defs. Ex. 5 at 26:20-27:1.

Tennessee would recognize a business relationship on the facts alleged, particularly because Genesco had satisfied the pre-conditions to closing.[27]

Plaintiff has also pleaded the fourth element of the tort. As the court held in *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, ---- S.W.3d ----, 2007 WL 134132 (Tenn. Ct. App. 2007), "*either* 'improper motive' or 'improper means' will suffice." (emphasis in original).

While I agree with defendants that plaintiff has not alleged an improper motive, plaintiff has alleged improper means. The *Trau-Med* court described "improper means" as means that are illegal, independently tortious, or that violate an established standard of a trade or profession. *Trau-Med*, 71 S.W. at 701, n.5. Examples of illegal or tortious conduct include violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship. *Id.* (citations omitted). Further, the *Trau-Med* court stated that "unethical conduct, such as sharp dealing, overreaching, or unfair competition" could also

---

[27] Defendants argue that plaintiff has no business relationship because the settlement in the Declaratory Judgment Action terminated the Merger Agreement. This argument misses the point, as it is plaintiff's claim that defendants' interference led to the abandonment of the merger.

constitute "improper means." *Id.*

Plaintiff alleges that UBS filed a counterclaim for fraud against Genesco in the Genesco Action. Compl. ¶ 49; *see also* Compl ¶ 51.[28] He also alleges that the Chancery Court concluded Genesco had not defrauded UBS. Compl. ¶ 53. Drawing all inferences in favor or plaintiff, as I must on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), the allegations of the Complaint are sufficient to allege that defendants engaged in unfounded litigation. While this "mudslinging in an attempt to get out of" contractual obligations, Compl. ¶ 49, came after Genesco instituted its lawsuit seeking specific performance of the Merger Agreement, it may still be found to constitute interference as plaintiff has alleged that Finish Line would have closed on the merger in any event if UBS had provided the financing.[29] Compl. ¶ 64.

For these reasons, defendants' motion to dismiss on the grounds that plaintiff has failed to state a claim for tortious

---

[28] Plaintiff cites additional examples of UBS's bad faith during the litigations that have ensued since the merger fell through. Aside from the allegation concerning the counterclaim, these examples were not pleaded in the Complaint, but rather contained only in the plaintiff's legal briefs. Thus, I do not consider them for the purposes of this motion. *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) ("district court errs when it . . . relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.").

[29] Defendants contend that, because plaintiff did not have a valid business relationship, plaintiff has failed to satisfy the second, third, and fifth elements of the tort. Because I conclude that plaintiff did have a valid relationship, and because defendants make no other arguments concerning plaintiff's failure to satisfy these elements, I find plaintiff has pleaded these elements as well.

interference with a business relationship is denied.

## Conclusion

For the reasons set forth above, defendants' motion to dismiss is denied.  The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated :  Brooklyn, New York
         April 30, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                          United States District Judge