UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Howard Lasker,

08-CR-854(CPS)(RER)

                              Plaintiff,

        - against -

                                          MEMORANDUM
                                          OPINION AND ORDER

UBS Securities LLC and UBS Loan Finance
LLC,

                              Defendants.

----------------------------------------X

SIFTON, Senior Judge.

        Howard Lasker ("plaintiff"), on behalf of himself and others

similarly situated, filed this purported class action against UBS

Loan Finance LLC and UBS Securities LLC (collectively "UBS") on

February 1, 2008[1] alleging tortious interference with a business

relationship arising out of a planned, but aborted, merger

between Genesco, Inc. ("Genesco") and The Finish Line, Inc.

("Finish Line").  Now before this court is UBS's motion for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For

the reasons set forth below, UBS's motion is granted.

## Background

        The following statement is drawn from the complaint and is

_____

        [1]  The case was originally filed in New York State Supreme Court and
removed to this Court on February 28, 2008.  This action was removed to
federal court, pursuant to 28 U.S.C. § 1332(d)(2), since it is a purported
class action.  28 U.S.C. § 1332(d)(2)(A) gives federal courts original
jurisdiction over class actions where the amount in controversy exceeds
$5,000,000 and a member of the class of plaintiffs is a citizen of a different
state from any defendant.

assumed to be true for purposes of this motion.  Plaintiff is a
resident of Brooklyn, New York, and a holder of Genesco common
stock.  Non-party Genesco, a Tennessee corporation that maintains
its headquarters in Nashville, Tennessee, is a retailer and
wholesaler of branded footwear and a retailer of branded head
wear.  Genesco's shares are traded on the New York Stock
Exchange.  Non-party Finish Line, an Indiana corporation that
maintains its headquarters in Indianapolis, Indiana, is a large
mall-based retailer of athletic apparel and shoes operating under
the Finish Line, Man Alive, and Paiva brand names.  Finish line's
shares are traded on the NASDAQ Global Select Market.  Headwind,
Inc. ("Headwind") is a Tennessee corporation and wholly owned
subsidiary of Finish Line formed for the sole purpose of
completing a merger between Finish Line and Genesco.

Defendants UBS Securities LLC and UBS Loan Finance LLC are
wholly owned subsidiaries of UBS AG and Delaware corporations
with their principal places of business in New York.[2]  UBS AG is
an investment banking and securities firm headquartered in
Zurich, Switzerland.

On June 17, 2007, Finish Line entered into an Agreement and
Plan of Merger ("Merger Agreement") to acquire Genesco.  UBS

---

[2]  According to plaintiff's complaint, UBS Loan Finance LLC maintains
offices in Connecticut, but defendants state in their removal papers that UBS
Loan Finance LLC's principal place of business is New York.  There appears to
be no dispute that at least one member of the putative class is a citizen of a
state other than Delaware, New York, or Connecticut.  *See* 28 U.S.C. §
1332(d)(2)(A).

Securities LLC served as Finish Line's financial advisor in
connection with the merger and issued an opinion to Finish Line
that the merger was fair from a financial point of view to Finish
Line and its shareholders.  Pursuant to the Merger Agreement,
Finish Line was to pay $54.50 per share in cash for all the
outstanding common stock of Genesco held by plaintiff and other
members of the purported class.  The merger was to be funded by
$1.6 billion in debt financing from UBS.  The Merger Agreement
expressly stated that it conferred no rights upon any party as a
third-party beneficiary.  Further, pursuant to the Merger
Agreement, if Genesco suffered a Material Adverse Effect, UBS
would be excused from its obligations under the Agreement.  Both
the Merger Agreement and Commitment Letter, however, specifically
excluded performance shortfalls due to industry-wide fluctuations
from the definition of Material Adverse Effect.[3]

---

[3]  Section 3.1(a) of the Merger Agreement defines Company Material
Adverse Effect, in relevant part, as follows:

> [A]ny event, circumstance, change or effect that, individually or
> in the aggregate, is materially adverse to the business, condition
> (financial or otherwise), assets, liabilities or results of
> operations of the [Genesco] and [Genesco] Subsidiaries, taken as a
> whole; provided, however, that none of the following shall
> constitute, or shall be considered in determining whether there
> has occurred, and no event, circumstance, change or effect
> resulting from or arising out of any of the following shall
> constitute a . . . Material Adverse Effect: . . . (B) changes in
> the national or world economy or financial markets as a whole or
> changes in general economic conditions that affect the industries
> in which [Genesco] and the [Genesco] Subsidiaries, so long as such
> changes or conditions do not adversely affect [Genesco] and the
> [Genesco] Subsidiaries . . . in a materially disproportionate
> manner relative to other similarly situated participants in the
> industries or markets in which they operate . . . (D) the
> failure, in and of itself, of the Company to meet any published or
> internally prepared estimates of revenues, earnings or other

Finish Line and UBS executed a commitment letter ("Commitment Letter") setting forth the terms of the financing on June 17, 2007. Also on June 17, 2007, Finish Line filed a Form 8-K[4] with the Securities and Exchange Commission ("SEC"), announcing the UBS commitment.

Genesco filed its proxy statement[5] with the SEC on July 11, 2007. On July 23, 2007, the SEC notified Genesco that it would not review the proxy statement and that Genesco could file and disseminate it. Shortly thereafter, Finish Line informed Genesco that it needed additional time to complete the UBS financing transaction.

On August 6, 2007, an article in the *Indianapolis Business Journal* reported that tightening of the credit markets along with a decline in Finish Line's operating performance and stock price "spooked" UBS and that some analysts had begun speculating

---

financial projections, performance measures or operating statistics; provided, however, that the facts and circumstances underlying any such failure may, except as may be provided in subsection (A), (B), (C), (E), (F), and (G) of this definition, be considered in determining whether a Company Material Adverse Effect has occurred . . .

Shapiro Decl. Ex. 2, at 8-9 (Merger Agreement).

[4] A Form 8-K is the SEC form used for companies' current reports pursuant to Sections 13 and 15(d) of the Exchange Act, 15 U.S.C. §§ 78m(a)(2), 78o(d). A Form 8-K must be filed upon the occurrence of certain significant corporate events as defined by the SEC and may be filed with respect to any other matter the company considers of material importance.

[5] Congress and SEC proxy rules require that specified information be given to security-holders either before or at the time of a proxy solicitation, regulate the presentation of that information, and prohibit false or misleading statements in proxy materials. *See* 15 U.S.C. § 78n(a); 17 C.F.R. §§ 240.14a-1 — 240.14b-2.

whether UBS would "pull the plug" on its financing commitment. The article further reported that Finish Line's Chief Financial Officer, Kevin Wampler, stated during a June 29, 2007 conference call with analysts that neither Finish Line's falling share price nor the tightening of the credit markets "give UBS an out" from its financing commitment.

On August 14, 2007, the necessary regulatory approvals for the merger were obtained.  On August 30, 2007 Genesco issued a press release announcing its second quarter 2007 financials. Genesco's earnings were lower than analysts' estimates and it reported a loss of $0.13 per share.

On September 11, 2007, UBS wrote to Finish Line that UBS was "extremely concerned" about the "apparent deteriorating financial position" of Genesco and that UBS was reserving its rights with respect to its obligation to complete the financing.  The financial results announced by Genesco on August 30, 2007, were consistent with results experienced by others in the industry, including Finish Line.[6]  UBS had been receiving weekly updates concerning Genesco's financial results.

On September 13, 2007, UBS wrote a second letter to Finish Line to report that UBS was "not yet satisfied that Genesco has not experienced a Material Adverse Effect."  On September 14,

_____

[6]  For example, on September 13, 2007, Finish Line issued a press release noting decreased sales and giving explanations similar to those given by Genesco, including a shift of certain states' sales tax holidays to August and later school start dates in several states.

2007, in response to this contention, Genesco issued a press
release stating, "no 'material adverse effect' under the
previously announced merger agreement with Finish Line has
occurred with respect to Genesco."

On September 17, 2007 Genesco's shareholders, at a special
shareholder meeting, approved the merger.  Thus, as of September
17, 2007, Genesco had satisfied all of the pre-conditions to
closing set forth in the Merger Agreement.  Pursuant to the
Merger Agreement, an obligation to close on or before September
19, 2007 was triggered.

On September 18, 2007, counsel for Finish Line e-mailed
counsel for Genesco to advise Genesco that UBS decided to stop
any further work towards closing the financing transaction
"pending the results of its analyses of Genesco's financial
condition and performance."

On September 19, 2007, Genesco issued a press release which
contained a letter from its Chairman and Chief Executive Officer,
Hal Pennington.  Pennington stated that Finish Line and UBS had
failed to meet deadlines for obtaining the UBS financing needed
to consummate the merger and set forth his belief that UBS was
looking for a way out of its commitment because certain external
factors, including upheaval in the credit markets, made the

merger less profitable for UBS.[7]

Also on September 19, 2007, Finish Line issued a press release announcing that UBS had decided to stop work on the closing documents for the financing and that Finish Line would "consider its options" under the Merger Agreement.

On September 21, 2007, Genesco filed suit in Chancery Court in Nashville, Tennessee ("Chancery Court"), against Finish Line and UBS ("Genesco Tennessee Action") seeking an order requiring Finish Line to consummate the Merger with Genesco and to enforce Finish Line's rights against UBS under the Commitment Letter.

On October 9, 2007, plaintiff filed a purported class action in the Chancery Court against Finish Line, Headwind, and UBS ("Lasker State Action"). The factual predicate for plaintiff's claims against the defendants in the Lasker State Action was the same as the predicate in the instant matter, the aborted Genesco-Finish Line merger. As in the complaint in this case, plaintiff accused UBS of undermining the merger and asserted that UBS's alleged conduct harmed Genesco shareholders by preventing the

---

[7] On October 1, 2007, UBS revealed that it would write down $3.6 billion from bad investments related to, among other things, United States sub-prime mortgages. Mark Rohner, UBS AG's Chief Executive Officer, announced that UBS AG was changing the bank's investment focus as it had been too free with its funding in high volume, high grade exposure. Shortly thereafter, UBS AG admitted it was unlikely to be profitable in the fourth quarter of 2007 because of further possible write downs. UBS AG further stated that of the more than $40 billion it held in sub-prime paper or collateralized debt obligations ("CDO"), $13.8 billion in mezzanine CDO's could be vulnerable (mezzanine classes of investments are usually second to senior classes to receive interest and principal payments in the case of default). UBS reported further negative news in December 2007, including a December 10, 2007 announcement that it would write down $10 billion in bad investments.

merger from closing.  Plaintiff sought to compel Finish Line's

specific performance of the Merger Agreement or, in the

alternative, compensatory damages.  Against UBS, plaintiff

alleged that UBS aided and abetted breach of the Merger Agreement

and sought compensatory damages.  He later re-characterized his

claim as one of procurement of breach of contract.[8]

UBS and Finish Line filed their answers in the Genesco

Tennessee Action on November 15, 2007.  They asserted that

Genesco had suffered a Material Adverse Effect, that Genesco

committed securities fraud, and that Genesco fraudulently induced

Finish Line to enter into the Merger Agreement by failing to

provide material information concerning Genesco's May performance

and updated projections prior to the signing of the Merger

Agreement.[9]  UBS's Answer asserted a counterclaim for fraud.[10]

The next day, Pennington, Genesco's CEO, rejected UBS's claim of

---

[8] Under Tennessee Law, procurement of breach of contract requires proof
of seven elements:  (1) a legal contract to which plaintiff is a party; (2)
knowledge of the existence of the contract; (3) an intention to induce its
breach; (4) malice; (5) breach of contract; (6) proximate cause; and (7)
damages.  *Hauck Mfg. Co. v. Astec Industries, Inc.*, 376 F.Supp. 2d 808, 832
(E.D.Tenn. 2005); *see also Federated Rural Elec. Ins. Exchange v. Hill*, 2007
WL 907717, at *13 (Tenn. Ct. App. Mar. 26, 2007).  In Tennessee, the common
law action for tortious interference with contract and the statutory action
for unlawful procurement of breach of contract, *see* Tenn. Code Ann. §
47-50-109, have the same elements and operate as alternative theories of
recovery.  *Hauck Mfg.*, 376 F. Supp.2d at 832.

[9] UBS's Answer incorporated Finish Line's affirmative defenses.

[10] On November 26, 2007, Genesco received a subpoena from the United
States Attorney's Office for the Southern District of New York for all
documents relating to Genesco's negotiations and Merger Agreement with Finish
Line.  The subpoena stated that the documents were sought in connection with
alleged violations of federal fraud statutes.

fraud.

Chancellor Lyle, of the Tennessee Chancery Court, dismissed the Lasker State Action on November 30, 2007, ruling that, in light of the express disclaimer in the Merger Agreement of third-party beneficiaries, Genesco's shareholders were not entitled to the benefits of the Merger Agreement.

Chancellor Lyle tried the Genesco Tennessee Action from December 10 through December 18, 2007. On December 27, 2007, Chancellor Lyle ruled that all conditions to the Merger Agreement had been met and that UBS had not been defrauded by Genesco. Although the court concluded that a Material Adverse Effect had occurred, it found that it was caused by general economic conditions, which had been eliminated as a basis for invalidation in the Merger Agreement itself. Accordingly, the Chancery Court ordered Finish Line specifically to perform the terms of its Merger Agreement with Genesco. Chancellor Lyle also dismissed certain of UBS's and Finish Line's counterclaims and affirmative defenses based on fraud.[11] The Chancery Court noted, however, that there was a pending declaratory judgment action in the Southern District of New York between UBS, Finish Line, and Genesco in which UBS sought a declaration that the combined Finish Line-Genesco entity would be insolvent ("Declaratory

---

[11] Both UBS and Finish Line appealed this decision. The Tennessee Court of Appeals dismissed the appeal because it concluded that the December 27, 2007 Order "[was] not a final judgment." Shapiro Decl. Ex. 14, at 1 (Court of Appeals' Order).

Judgment Action"),[12] and if that court concluded the combined entity would be insolvent, the merger would be halted.

On December 26, 2007, plaintiff appealed the Chancery Court's decision dismissing his claims against UBS. Plaintiff moved to dismiss his appeal on April 29, 2008. The Tennessee Court of Appeals granted plaintiff's motion and dismissed the appeal on May 13, 2008.

On March 4, 2008, the parties in the Genesco Tennessee Action reached a settlement agreement.[13] This settlement also disposed of the claims in the Declaratory Judgment Action. On April 24, 2008, pursuant to the settlement agreement, the Chancery Court dismissed the Genesco Tennessee Action with prejudice, taxing costs one half to UBS and one half to Finish Line. Chancellor Lyle declined, however, to vacate her December 27, 2007, Memorandum Opinion & Order.

On March 13, 2008, UBS moved to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6). I denied UBS's motion by Memorandum Opinion and Order on April 30, 2008. *Lasker v. UBS*, 2008 WL 1968737 (E.D.N.Y. April 30, 2008).

## Discussion

I. <u>Rule 12(c) Standard</u>

---

[12]  UBS filed the Declaratory Judgment Action on November 15, 2007.

[13]  Pursuant to the settlement, UBS and Finish Line transferred to Genesco $175 million and 12% of Finish Line stock.

In deciding a Rule 12(c) motion, courts apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999). Accordingly, courts must look at whether the complaint has pled "enough facts to state a claim to relief that is plausible on its face." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)).

## II. <u>Res Judicata</u>

Under Tennessee law,[14] the doctrine of res judicata, or claim preclusion, "bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit." *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 459 (Tenn. 1995); *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987). "The doctrine of res judicata is based on the principle not only that the same parties in the same capacities should not be required to litigate anew a matter which might have been determined and settled in the former litigation, but that litigation should be determined with reasonable expedition, and

---

[14] Neither party disputes that Tennessee law is applicable and both extensively cite Tennessee cases.

not be protracted through inattention and lack of diligence."
*McKinney v. Widner*, 746 S.W.2d 699, 705 (Tenn.Ct.App. 1987)
(citation omitted).

"The most straightforward application of the res judicata
doctrine involves plaintiffs who split their causes of action.
The doctrine prevents these plaintiffs from fragmenting their
accrued claims by litigating part of them to a final judgment and
then filing a second suit against the same defendant on alternate
claims or theories." *Lowe v. First City Bank of Rutherford
County*, 1994 WL 570082, at *3 (Tenn.Ct.App. Oct. 19, 1994)
(citing *American Nat'l Bank & Trust Co. v. Clark*, 586 S.W.2d 825,
827 (Tenn. 1979)); *National Cordova Corp. v. City of Memphis*, 214
Tenn. 371, 380, 380 S.W.2d 793, 797 (1964)); *see also Lien v.
Couch*, 993 S.W.2d 53, 56 (Tenn.Ct.App. 1999) ("The principle of
claim preclusion prevents parties from splitting their cause of
action and requires parties to raise in a single lawsuit all the
grounds for recovery arising from a single transaction or series
of transactions that can be brought together").

The *McKinney* court refused to accept the argument that "by
disclaiming or failing to present a particular fact or theory
supporting [plaintiff's] action, a plaintiff may thereby reserve
and preserve the disclaimed and unpresented fact or theory as an
'ace in the hole' to be used as a ground for a second lawsuit
based on such ground."  746 S.W.2d at 706; *see also Barnett v.*

*Milan Seating Systems*, 215 S.W.3d 828, 835 (Tenn. 2007) ("A plaintiff may not, by disclaiming or failing to present a particular fact or theory, preserve such fact or theory to be used as a ground for a second suit"). The *McKinney* court concluded "[t]o assent to plaintiff's insistence would be to condone piecemeal presentation of suits and defenses at the whim of the parties. Such is not the policy of our law and is contrary to the authorities . . ." 746 S.W.3d at 706.

"Parties asserting a res judicata defense must demonstrate that (1) a court of competent jurisdiction rendered the prior judgment, (2) the prior judgment was final and on the merits, (3) the same parties or their privies were involved in both proceedings, and (4) both proceedings involved the same cause of action." *Mitchell v. Hutchins*, 2006 WL 287372, at *2 (Tenn.Ct.App. Dec. 6, 2006) (citing *Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990)).

At issue are the second and fourth prongs of this test.

*A. Prior Judgment on the Merits*

UBS moved to dismiss the Lasker State Action pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure, for failure to state a claim. Katz Decl. Ex. B at 2. To make out a procurement of breach claim, a plaintiff must preliminarily show the existence of a legal contract to which plaintiff is a party. *Hauck Mfg. Co. v. Astec Industries, Inc.*, 376 F. Supp.2d 808, 832

(E.D.Tenn. 2005).

Plaintiff argues that Chancellor Lyle dismissed plaintiff's claim against UBS for lack of standing, which it correctly argues would not be an adjudication on the merits. *See Parrish v. Marquis*, 172 S.W.3d 526, 531 (Tenn. 2005). UBS, however, moved for dismissal of the Lasker State Action for failure to state a claim, pursuant to Tenn. R. Civ. P. 12.02(6),[15] Katz Decl. Ex. B., and contends that a decision on a 12.02(6) is a decision on the merits for res judicata purposes. *See Boyd v. Bruce*, 2001 WL 1346264, at *6 (Tenn.Ct.App. Nov. 2, 2001); *Joiner v. Carter*, 2007 WL 1860706, at *3 (Tenn.Ct.App. 1994).

During the oral argument on the defendants' motions to dismiss in the Lasker State Action, Chancellor Lyle stated ". . . there is no . . . procurement of breach since there was no contract that they are a party to as a third-party beneficiary." Shapiro Decl. Ex. 12 at 13. Chancellor Lyle later ruled that "there could be no procurement of breech (sic) cause of action against UBS because there isn't a contract status for these movants." *Id*. at 30-31.[16] The Order entered by Chancellor Lyle

---

[15] UBS's motion to dismiss the Lasker state action did, however, note that ". . . Plaintiff lacks standing to pursue claims based on the Merger Agreement because he is not a party or third-party beneficiary to that contract." Katz. Ex. B. at 1.

[16] Chancellor Lyle relied upon *Amsouth Erectors, LLC v. Skaggs Iron Works, Inc.*, 2003 WL 21878540, at *4 (Tenn.Ct.App. Aug. 5, 2003), which affirmed the grant of summary judgment in favor of certain defendants on the grounds that plaintiff was not a third-party beneficiary and therefore not entitled to enforce the contracts at issue.

states simply that UBS's motion was granted and plaintiff's complaint dismissed with prejudice.    Shap. Rep. Decl. Ex. 1.

In *Boyd v. Prime Focus, Inc.*, 83 S.W.3d 761 (Tenn.Ct.App. 2001), plaintiffs asserted claims against two defendants that they alleged were their employers.    The defendants moved to dismiss for failure to state a claim and for failure to join an indispensable party.    The trial court concluded that there was no employee-employer relation between the parties and dismissed the suit.    Plaintiffs filed a second suit against another defendant and then amended that complaint to include the defendants from the first action.    The trial court struck the amended complaint and sanctioned plaintiffs on the grounds that the complaint was barred by res judicata.    Plaintiffs argued that the earlier dismissal had been for failure to join an indispensable party. The Court of Appeals disagreed, noting that the:

> trial court specifically found: 1) Plaintiffs' claims
> were dependent on the existence of an employer-employee
> relationship between the Plaintiffs and Defendant; 2)
> that an employer-employee relationship existed between
> Plaintiffs and [defendant in second action]; 3) that
> [defendant in second action] was an indispensable party
> to the claim; and, 4) that no employer-employee
> relationship existed between Plaintiffs and [defendants
> in the first action].    The trial court thus granted the
> motion to dismiss for failure to state a claim, as well
> as for failure to join an indispensable party.    This
> was not a procedural order, nor did the court specify
> that it was not to be considered an adjudication on the
> merits.    We read the order as plainly granting the
> motion to dismiss for failure to state a claim.

*Boyd*, 83 S.W.3d at 766; *see also* Tenn. R. Civ. P. 41.02 ("Unless

the court in its order for dismissal otherwise specifies, a
dismissal under this subdivision and any dismissal not provided
for in this Rule 41 [voluntary dismissal], other than a dismissal
for lack of jurisdiction or for improper venue or for lack of an
indispensable party, operates as an adjudication upon the
merits").

In this case, plaintiff's claim for procurement of breach of
contract required a finding of a contractual status between
plaintiff and UBS.  UBS moved to dismiss for failure to state a
claim.  Chancellor Lyle did not indicate that her decision was
not on the merits, nor is her decision inconsistent with a
conclusion that it was on merits.  Further, there is no
indication that the dismissal was for lack of jurisdiction,
improper venue, or lack of an indispensable party.  Accordingly,
I conclude that this decision was on the merits.

B.  *Same Cause of Action*

"The principal test for determining whether the causes of
action are the same is whether the primary right and duty or
wrong are the same in each case."  *Gerber v. Holcomb*, 219 S.W.3d
914, 917-18 (Tenn.Ct.App. 2006) (quoting *Hutcheson v. Tenn.
Valley Auth.*, 604 F. Supp. 543, 550 (M.D.Tenn. 1985)).  "Stated
in transactional terms, [res judicata] provides that a valid and
final judgment extinguishes all claims arising out of the same
transaction or series of transactions from which the cause of

action arose." *XL Sports, Ltd. v. 1,060,000 Plus Interest Traceable to Respondent*, 2006 WL 197103, at *10 (Tenn.Ct.App. Jan. 26, 2006) (quoting *Lowe v. First City Bank of Rutherford County*, 1994 WL 570082 578, at *3 (Tenn.Ct.App. Oct. 19, 1994)); *Lien*, *supra*.

Numerous Tennessee courts have held actions barred when the second lawsuit stemmed from the same set of facts as the first. *See*, *e.g.*, *Patton v. Estate of Upchurch*, 242 S.W.3d 781, 790 (Tenn. Ct. App. 2007) (breach of contract claim brought in second suit, which had been raised but not litigated in first suit, barred by *res judicata* since both sought compensation for the same underlying wrong); *XL Sports*, 2006 WL 197103, at *10 (dismissing plaintiff's constructive trust claim when it arose from the same transaction as its other claims, which had already been litigated in federal court); *Bernard v. Sumner Regional Health System,* 2003 WL 22994299, at *3-4 (Tenn.Ct.App. Dec. 22, 2003) (res judicata barred claim that violation of internal by-laws resulted in breach of contract where plaintiff had already brought procurement of breach of contract claim against same defendant arising out of the same set of facts leading to plaintiff's termination);[17] *Boyd v. Bruce*, 2001 WL 1346264, at *4 (Tenn.Ct.App. Nov. 2, 2001) ("A change in Appellants' theory of

---

[17] For these reasons, plaintiff's citation to *Lyons v. Mazda Am. Credit Co.*, 2005 WL 2174476 (W.D.Tenn. Sept. 6, 2005), is inapposite.

liability does not create a new cause of action"); *Brown v.
Brown*, 29 S.W.3d 491, 496 (Tenn.Ct.App. 2000) (Claim that alimony
payments were no longer required since spouse had remarried,
where second marriage had been known for several years and the
issue of the payment of alimony had been before the court on at
least three occasions during this time, barred by res judicata).

A judgment will not have res judicata effect on rights that
have not yet accrued or when intervening events have altered the
parties' legal rights or relationships. *White v. White*, 876
S.W.2d 837, 839-40 (Tenn. 1994). Since it is undeniable that
plaintiff's tortious interference claim arises out of the same
facts and circumstances as its procurement of breach claim, the
question is whether plaintiff could or should have brought the
tortious interference claim in the Lasker State Action or whether
it did not arise until the occurrence of intervening events.

There is no dispute that plaintiff, based on its theories,
could have alleged the first, second, third, and fifth elements
of a claim for tortious interference in the Lasker State
Action.[18] Plaintiff alleges that a business relationship between

_____

[18] To assert a claim for tortious interference with a business
relationship, a plaintiff must show:

(1) an existing business relationship with specific third parties
or a prospective relationship with an identifiable class of third
persons; (2) the defendant's knowledge of that relationship and
not a mere awareness of the plaintiff's business dealings with
others in general; (3) the defendant's intent to cause the breach
or termination of the business relationship; (4) the defendant's
*improper motive or improper means*; and finally, (5) damages
resulting from the tortious interference.

Finish Line and Genesco's shareholders arose out of Finish Line's status as acquirer or potential acquirer of Genesco.  Compl. ¶ 59; Pl.'s Opp. to Def. Mot. to Dismiss at 9.  It is undisputed that UBS had advised on and knew about the Merger Agreement.  *See* Compl. ¶ 60.  Further, according to the Complaint, UBS's intent to get out of its financing commitment, and thus cause the termination of the business relationship, began in August 2007, with the tightening of credit markets.  Compl. ¶ 33.  The Complaint alleges this intent was formed by September 19, 2007, at the very latest, when Genesco's Chief Executive Officer stated that UBS was looking for a way out of the commitment letter. Compl. ¶ 43.  As to the fifth element, any damages arising from the alleged tortious interference were known to plaintiff at the time he filed his State Action, since the damages alleged are identical to those sought in this matter.  *Compare* State Compl. ¶ 29 *with* Compl. ¶ 59.  The fourth element of tortious interference, improper motive or improper means, however, requires further discussion.

Plaintiff argues two contradictory positions in an attempt to avoid dismissal on res judicata grounds.  He originally argued that the action was not barred by res judicata because to plead

---

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)
(footnotes and citations omitted) (emphasis in original).  Among examples of
improper means, the *Trau-Med* court listed unfounded litigation and sharp
dealing.  *Id.* at 701, n.5.

the fourth element through allegations of unfounded litigation, a plaintiff must allege a favorable termination, which he could not do until after the Lasker State Action was dismissed.[19] Following a request from the Court that the issue be further briefed, plaintiff reversed his position and argues both that unfounded litigation does not require favorable termination and that he has pleaded the fourth element through allegations of other actions undertaken by UBS.

       i.   Favorable Termination Required

Relying on cases from states other than Tennessee that, in examining whether unfounded litigation had been pleaded under analogous tortious interference claims, plaintiff's original opposition to UBS's current motion argued that unfounded litigation required an allegation of successful termination, akin to claims of malicious prosecution. Pl.'s Opp. at 14 (citing *Zeller v. Consolini*, 667 A.3d 64 (Conn. 1995), *Manita v. Hanson*, 79 P.3d 404, 429 (Oregon Ct. App. 2003), and *Formula One Licensing B.V. v. Purple Interactive Ltd.*, 2001 WL 34792530, at

---

[19] In denying UBS's motion to dismiss for failure to state a claim, I previously determined that plaintiff had successfully pleaded improper means by alleging that UBS engaged in unfounded litigation on the basis of Chancellor Lyle's dismissal of UBS's counterclaim. *Lasker*, 2008 WL 1968737, at *9. Having found that plaintiff stated a claim with the allegation of unfounded litigation, I did not address whether plaintiff's other allegations established improper means.

    The question of whether favorable termination is required to plead unfounded litigation was not put before me on UBS's 12(b)(6) motion to dismiss, and I need not decide the issue here since, for the reasons set forth below, plaintiff's claim must be dismissed whether there is such a requirement or not.

*5 (N.D.Cal. Feb. 6, 2001)). Plaintiff accordingly contended that since he could not have pleaded improper means through allegations of unfounded litigation until after the State Court dismissed UBS's counterclaim for fraud against Genesco, which occurred after the dismissal of the Lasker State Action, res judicata could not bar his claim. Pl.'s Opp. at 13-16.

The Genesco Tennessee Action, however, never terminated in favor of Genesco. Although UBS's counterclaim was dismissed, the dismissal order was not a final order; it did not decide the issue of whether the combined Genesco-Finish Line entity would be solvent. Shapiro Decl. Ex. 14, at 1 (Order of Tennessee Court of Appeals denying UBS's appeal because it concluded that the December 27, 2007 Order "[was] not a final judgment"); *see also* Shapiro Rep. Decl. Ex. 3 (Order of Chancery Court clarifying that "December 27, 2007 Order . . . [was] not a final order"). Rather, the final termination of the overarching Genesco Tennessee Action was brought about by settlement of all parties, including UBS, in April 2008. Shapiro Rep. Decl. Ex. 4. It is axiomatic that settlement is not a favorable termination. *See Foshee v. So. Fin. & Thrift Corp.*, 967 S.W.2d 817, 819 (Tenn. Ct. App. 1997) ("a cause dismissed pursuant to a compromise and/or settlement is an indecisive termination"); *see also Parrish*, 172

S.W.3d at 530.[20]

Plaintiff argues that, following the settlement, UBS moved for vacatur of the December 27, 2007 Order, but the Chancery Court vacated, as moot, only the portion of the order requiring specific performance and left all the findings adverse to UBS in force. This argument, however, does not alter the fact that the Order was, and remains, a non-final order. It would be improper to consider it a favorable termination when UBS cannot appeal from it. Plaintiff also argues that the Chancery Court taxed costs to UBS and Finish Line in favor of Genesco in its April 24, 2008 Order and that this evidences the litigation terminated in favor of Genesco. It was not the Chancery Court, however, that determined to tax costs to Genesco as the prevailing party. Instead, the parties so agreed, *see* Shapiro Supp. Decl. Ex. 2., and the Court entered its Order exactly as the parties had proposed.

Accordingly, if favorable termination is required, plaintiff cannot, as a matter of law, state a claim for tortious interference based on the dismissal of UBS's counterclaim.

ii. Favorable Termination Not Required

---

[20] Plaintiff cites *Parrish* for the proposition that "[a] court must examine the circumstances of the underlying proceeding to determine whether a specific result was a favorable termination." Pl. Rep. Br. at 5. This language is consistent with UBS's position since the *Parrish* court, undertaking this examination, concluded that termination of the *underlying* litigation was not on the merits since termination was based on the statute of limitations. *Parrish*, 172 S.W.3d at 531-33.

As requiring favorable termination would result in
plaintiff's inability to state a claim premised upon UBS's
counterclaim, plaintiff alternatively argues there is no such
requirement for unfounded litigation under Tennessee Law.  Pl.'s
Rep. at 6-8 (citing, *inter alia*, *Trau-Med of Am., Inc. v.
Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)).[21]  This does
not save plaintiff's claim, however.

Tennessee courts and courts interpreting Tennessee law have
held that a party, in the absence of formal barriers, should seek
a stay and/or amend its pleading to incorporate new claims or
facts that arise prior to final adjudication, and must
demonstrate that conduct occurring after a judgment in a prior
action, in order to avoid claim preclusion, could not have been
discovered by the plaintiff, exercising reasonable due diligence.
*Smith Mech. Contractors, Inc. v. Premier Hotel Development* Grp.,
210 S.W.3d 557, 566 (Tenn. Ct. App. 2006) ("[o]nce [plaintiffs]
learned that the [defendant] had filed the Performance Bond, any
challenge to that event could and should have been filed in the
same first lawsuit"); *Milligan v. George*, 1997 WL 379138, at *5,
n.4 (Tenn. Ct. App. July 9, 1997) ("[T]he doctrine of res

---

[21]  The *Trau-Med* court found that plaintiff had alleged improper means
by pleading that Allstate "interfered with six specific actions filed in the
Circuit Court of Shelby County by making false statements about the propriety
of Trau-Med's business and by threatening to protract the litigation process."
*Id.* at 701.  In finding that improper means had been alleged, the Trau-Med
court did not explicitly require, nor did Trau-Med allege, that the motions
filed in the six actions had been favorably terminated.  *See id.; see also*
Katz Rep. Decl. Ex. L.

judicata applies . . . to the facts in existence at the time the earlier judgment was rendered"); *see also Heyliger v. State Univ. & Comm. Coll.*, 126 F.3d 845, 855-56 (6th Cir. 1997) (Res judicata barred plaintiff's Title VII claim because he could have sought a right to sue letter and amended his state court complaint, which alleged state law discrimination claims arising out of the same facts, prior to dismissal of state complaint); *Donald v. Frugal I, Inc.*, 74 Fed. Appx. 593, 597 (6th Cir. Sept. 9, 2003) (Plaintiffs' Title VII claims barred by res judicata because, once plaintiffs had received their right to sue letters from the EEOC, they should have attempted to assert them in previously filed state discrimination action).

Although only a couple of weeks elapsed between the filing of UBS's counterclaim and the dismissal of the Lasker State Action, I conclude that plaintiff, with reasonable diligence, could have put the matter in issue. Plaintiff does not contend he was unaware of UBS's counterclaim. Moreover, the tenor of the counterclaim echoed certain of plaintiff's other allegations in the Lasker State Action, including allegedly false accusations of fraud, *see*, *e.g.*, Lasker State Compl. ¶ 5, and arose out of the same underlying transaction at issue in both this and the Lasker State Action. Tennessee Rule of Civil Procedure 15.01 provides that "A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served . . ."

There is no indication that any party in the Lasker State Action
filed a responsive pleading prior to filing their motions to
dismiss, so plaintiff need not even have sought leave of the
court to amend his complaint. Accordingly, plaintiff's claim is
barred by res judicata even if no favorable termination was
required.[22]

     iii.  Other Actions of UBS

Plaintiff further contends that UBS interfered with
plaintiff's business relationship "by . . . making false
statements about Genesco, the reliability of its financial
reporting, the integrity of its senior management, filing
baseless fraud claims and disparaging its business and prospects
to derail the planned merger. Under *Trau-Med*, no more need be
alleged." Pl.'s Rep. at 8. Plaintiff continues, "[s]ince
plaintiff's pleading demonstrates that UBS engaged in threats,
intimidation and coercion and conduct that was, among other
things, defamatory, unethical, sharp, unfounded or otherwise
tortious, the improper means element has been established." *Id*.
at 9 (footnote omitted).

These assertions only underscore what UBS has argued from

---

[22]  Plaintiff's citation to *Ventas, Inc. v. Health Care Property
Investors*, 2007 WL 4547389 (W.D.Ky. Dec. 19, 2007), is inapposite.  In *Ventas*,
although the tortious acts had occurred during the pendency of the first
proceeding, the harm plaintiff alleged did not occur until afterwards.  In
this case, the harm had occurred at the time of the filing of the Lasker State
Action, since the damages sought in this and the State Action, are identical.

the start; that plaintiff's tortious interference claim had
accrued and could have been brought in the Lasker State Action.
Indeed, the majority of instances plaintiff cites as examples of
UBS's improper means, including UBS's choice to stop work on the
merger, allegedly false accusations of fraud, and the
orchestrating of circumstances to claim that the merged
Genesco/Finish Line entity would be insolvent, were alleged in
the Lasker State Complaint. *See* Lasker State Action Compl. ¶¶ 5-
6, 64, 71, 73, 75, 79-80, 83-85, 105. Having not addressed
whether these allegations were sufficient to state improper means
in *Lasker*, 2008 WL 1968737, due to my conclusion concerning UBS's
counterclaim, I now conclude that they do indeed state a claim,
for the reasons plaintiff argues and could have been put in issue
in the prior action.

That UBS filed its counterclaim and engaged in other
allegedly improper acts after plaintiff filed the Lasker State
Action does not defeat application of res judicata because these
acts would merely serve to supplement the claim and not create
it. *See Dubuc v. Green Oak Twp.*, 312 F.3d 736, 751 (6th Cir.
2002) ("The doctrine of *res judicata* would become meaningless if
a party could continue to relitigate the same issue . . . by
merely positing a few additional facts that occurred after the

initial suit").[23]

Plaintiff has found himself between a rock and a hard place. If, as plaintiff originally argued, favorable termination is required to plead unfounded litigation, then plaintiff's claim, while it may not be barred by res judicata because it was not ripe, fails because there was no favorable termination of the earlier litigation.  If, as plaintiff has most recently argued, favorable termination is not required, since his other allegations establish improper means, then his claim for tortious interference could have been brought in the Lasker State Action and is barred by res judicata.

### Conclusion

For the reasons set forth above, UBS's motion for judgment on the pleadings is granted and plaintiff's complaint is dismissed.  The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated :   Brooklyn, New York
          January 7, 2009

By: /s/ Charles P. Sifton (electronically signed)
           United States District Judge

---

[23] Many of plaintiff's additional examples of UBS's improper means were not pleaded in the Complaint, but rather contained only in the plaintiff's legal briefs.  I consider them but, based on *Dubuc*, *supra*, they do not alter my conclusion.